IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: ) | |
| ) | |
| BOBBIE GENE SMITH, ) | Case No. 06-60768 |
| ) | |
| Debtor. ) | |

### ORDER SUSTAINING, IN PART, DEBTOR'S OBJECTIONS TO CLAIMS BY LOUISIANA AG CREDIT, PCA (Claim No. 1) AND LEONARD MARTIN (Claim No. 6)

Debtor Bobbie Gene Smith objects to the claims filed by Louisiana Ag Credit, PCA. (Claim No. 1) and Leonard Martin (Claim No. 6). Louisiana Ag Credit's claim is oversecured, and Martin's claim is unsecured. Both objections involve disputes as to the claimants' entitlement to postpetition interest and attorneys' fees. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). For the reasons that follow, IT IS ORDERED THAT Louisiana Ag Credit is entitled to retain all monies, including interest, which have been paid to it by the Chapter 12 Trustee, and is additionally owed allowed attorneys' fees in the amount of $29,672.33. Leonard Martin's claim will be allowed as an unsecured claim in the amount of $57,742.71, plus $3,000 in attorneys' fees, and postpetition interest at the judgment rate of 4.5%.

**Background**

The Debtor and Geoffrey Martin were each 50% owners of M & S Livestock Sales, L.L.C. ("M&S"), and later, B & G Livestock Sales, L.L.C. ("B&G"), both of which operated a livestock auction barn known as the "West Monroe Live Auction" in West Monroe,

Louisiana (the "Auction Barn").  The Debtor filed this Chapter 12 bankruptcy case on August 22, 2006.  Both of the disputed claims arose in connection with the Auction Barn's operations.  During the course of his bankruptcy case, the Debtor sold several parcels of real property.  As a result, all of the claims in the case, except for the two claims at issue here, have been paid.  In addition, Louisiana Ag Credit's claim has been paid from sale proceeds, except for the portion of its claim for postpetition attorneys' fees, which are discussed below.  As of the hearing date, the Trustee is holding $192,336.02 in proceeds from the sales, pending resolution of these claims objections.

## Louisiana Ag Credit's Claim

Louisiana Ag Credit asserts a claim of $484,967.58, plus post-petition interest at the default rate, and attorneys' fees.  Its claim is based on two promissory notes, both dated January 20, 2003, representing loans by Louisiana Ag Credit's predecessor, Production Credit Association,to B&G.  The first note is a Revolving Credit Promissory Note in the original principal amount of $250,000.  The second is a Promissory Note in the original principal amount of $210,275.  The Debtor is personally liable on both notes, along with B&G.  The notes are secured by a Collateral Note, a Collateral Mortgage and Security Agreement encumbering real property in Morehouse Parish, Louisiana, and a Mortgage with Power of Sale encumbering real property in Baxter County, Arkansas.

The revolving note matured on January 1, 2006.  Because B&G did not pay off that note by the maturity date, Louisiana Ag Credit accelerated the other note and declared both notes in default.  During the spring and summer of 2006, Louisiana Ag Credit attempted to

2

foreclose against both the Arkansas and Louisiana properties by filing lawsuits in those states' courts. In response, the Debtor filed a Chapter 12 Petition on August 22, 2006. Louisiana Ag Credit filed an amended proof of claim in the case, asserting that, as of the date of the amended claim, March 27, 2007, the total principal and interest due on both notes was $446,657.31, plus attorneys' fees of $38,310.27, for a total claim of $484,967.58. As stated above, Louisiana Ag Credit has been paid from the proceeds from the sale of its collateral, except for the portion of its claim representing the attorneys' fees.

## Leonard Martin's Claim

Leonard Martin filed an amended claim, asserting an unsecured nonpriority claim of $117,602.92, based on a January 20, 2003 Promissory Note and two checks he wrote to M&S.[1] Martin's Promissory Note provides for payment of interest at 4.85% per annum (with no default rate of interest), and further provides that "[i]f it becomes necessary to place this Note or any renewal thereof in the hands of an attorney for collection or suit, the makers hereof agree to pay twenty percent (20%) of all sums due under this Note as attorney's fees, which fees are agreed to be part of the principal obligation of this Note." For the reasons stated at the conclusion of the hearing held on November 8, 2007, I sustained, in part, the Debtor's objection to Martin's claim, and allowed the claim in the amount of $57,742.71, which, I concluded, represented the unpaid amount owed to Martin under the Promissory

---

[1] One of the checks Mr. Martin wrote was made payable to "WMLA," meaning "West Monroe Livestock Auction," which was the "dba" name under which the Auction Barn operated. That check was deposited into M&S's bank account.

Note as of the petition date.

Briefly, the Debtor's obligation to Leonard Martin arose out of a guaranty which Leonard Martin had executed to a bank, relating to a line of credit loan taken out by M&S in July 2000, in the amount of $125,000.  As mentioned above, the owners of M&S (and then B&G) were the Debtor and Geoffrey Martin, who is Leonard Martin's grandson.  In exchange for signing the guaranty, Leonard Martin demanded that the Debtor sign a note payable to him, to cover any amounts Leonard Martin would be called upon to pay to the bank if M&S did not do so.  After the 2000 line of credit was maxed out, the bank refused to make further advances to M&S.  Instead, the bank replaced the line of credit note with a term note in the amount then due, $129,855, on January 20, 2003.  Leonard Martin continued to guarantee that term note, and the Debtor in turn remained liable to him for any amounts that Leonard Martin was required to pay M&S.  No further advances were made by the bank.  Ultimately, Leonard Martin did pay off the bank, after which M&S reduced the balance due and owing to him to $57,742.71, which was the amount remaining due to him at the time of the bankruptcy filing.

In January 2006, the Auction Barn needed funds quickly to cover shortages in its custodial accounts, representing funds owed to sellers of cattle.  At the request of his grandson, Leonard Martin advanced an additional $57,080.43, by two checks drawn on his personal account and payable to M&S and WMLA.[2]  For the reasons stated at the hearing,

---

[2] As mentioned above, "WMLA" meant "West Monroe Live Auction," the name under which the Auction Barn operated.  Both of these checks were deposited into M&S' bank

I find that these advances do not come within the terms of the Debtor's guaranty to Leonard Martin, and that there was no agreement, or even any discussion, between Leonard Martin and the Debtor as to any personal liability on his part for those advances. Therefore, I allowed Leonard Martin's claim for the amount owed to him under the Promissory Note, which was $57,742.71.

As announced at the hearing, I took under advisement the question of whether Mr. Martin is entitled, in addition to an unsecured claim of $57,742.71, to interest and attorneys' fees incurred postpetition.

## The Claims for Postpetition Attorneys' Fees

Both claimants assert that they are entitled to their attorneys' fees incurred postpetition. Because Louisiana Ag Credit is oversecured, it asserts that it is entitled to a secured claim for its postpetition attorneys fees under § 506(b). That section provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.[3]

This section expressly entitles an oversecured creditor to include in its secured claim any reasonable fees, costs, and charges provided for in the underlying agreement with the

---

accounts.

[3] 11 U.S.C. § 506(b).

5

Debtor.[4] In order to recover attorneys' fees under § 506(b), a creditor must establish: (1) that it is oversecured in excess of the fees requested; (2) that the fees are reasonable; and (3) that the agreement giving rise to the claim provides for attorneys' fees.[5]

No one disputes that Louisiana Ag Credit is oversecured. Further, both of Louisiana Ag Credit's promissory notes provide for an award of "reasonable attorneys' fees" in the event of default.[6] Hence, § 506(b) entitles Louisiana Ag Credit to a secured claim for attorneys' fees, but only to the extent they are reasonable.

In the context of § 506(b), the court undertakes a two-part analysis in determining reasonableness of attorneys' fees.[7]

> First, the Court must determine whether the *actions* taken by the creditor were reasonable and prudent in the circumstances. If the actions were not reasonable and prudent, the fees should be disallowed. On the other hand, if the actions were reasonable and prudent, then the Court must determine whether the *itemized fees* are reasonable, and in that regard, the Court should

---

[4] *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *In re White*, 260 B.R. 870, 879 (B.A.P. 8th Cir. 2001).

[5] *In re Schriock Constr., Inc.*, 104 F.3d 200, 201 (8th Cir. 1997).

[6] Specifically, the Revolving Credit Promissory Note provides that, in the event that Louisiana Ag Credit declares the loan in default and accelerates the debt, it is entitled to "reasonable attorneys' fees in an amount not to exceed 20% of the total amount of principal and interest due under this Note, costs, expenses and other fees and charges as provided herein." It also provides that, if Louisiana Ag Credit refers the note to an attorney for collection, files suit, or if the borrower files for bankruptcy, then the borrower agrees to pay Louisiana Ag Credit's "reasonable attorneys' fees in an amount not exceeding 35%% [sic] of the total unpaid balance. . . ." The second Promissory Note provides that, if the note is not paid at its maturity and is placed in the hands of an attorney for collection, then Louisiana Ag Credit is entitled to "reasonable attorney's fees in an amount equal to 20% of the total of the unpaid debt."

[7] *In re Cushard*, 235 B.R. 902, 906 (Bankr. W.D. Mo. 1999); *see also In re Woods Auto Gallery, Inc.*, ___ B.R. ____, 2007 WL 4615692 *6 (Bankr. W.D. Mo. Dec. 27, 2007).

    consider the factors set out by the Eighth Circuit Court of Appeals in *Winter v. Cerro Gordo County Conservation Board*, 925 F.2d 1069, 1074, n.8 (8th Cir. 1991).[8]

I find that the actions taken by Louisiana Ag Credit in protecting its interests were reasonable and prudent under the circumstances. The Debtor was in default under the notes, so Louisiana Ag Credit needed to proceed with foreclosure and then to protect its interests in the Debtor's bankruptcy case. On the question of whether the *amount* of fees are reasonable, the Court considers the following factors:

    (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[9]

As the Court in *Cushard* did, I have reviewed Louisiana Ag Credit's claim for fees, and its detailed billing statements, and find that an extended discussion of each individual factor as it applies to this case is not warranted.[10] Rather, some general observations relating to the factors are appropriate.

Louisiana Ag Credit seeks a secured claim for fees it owes to two law firms in connection with its collection efforts under the notes, the Louisiana law firm of Wiener,

---

    [8] *Id.* at 906-07 (emphasis in original).

    [9] *Id.* at 909 (citing *Winter v. Cerro Gordo County Conservation Board*, 925 F.2d 1069, 1074, n.8 (8th Cir. 1991).

    [10] *Id.*

Weiss & Madison (the "Louisiana Firm"), and the Missouri firm of Shughart Thomson & Kilroy (the "Missouri Firm"). The Louisiana Firm provided services both prior to and after the filing of the bankruptcy case. The Missouri Firm provided only postpetition services.

The Louisiana Firm billed a total of $10,699.78 in fees and expenses for work prior to the filing of the petition. Included in the expenses for this period were a total of $2,872.17 paid to Arkansas counsel in connection with a foreclosure sale which was halted by the filing of the bankruptcy case. R. Joseph Naus, the Louisiana Firm's attorney who primarily worked on this case, testified that, since 1985, he has charged Louisiana Ag Credit at the rate of $100 per hour for all of his work, subject to upward revision at the end of a particular project if they recover funds from the obligor sufficient to pay a higher rate. He testified that his standard rate for other clients is $225 per hour. No other evidence was offered as to the reasonable rate for services in Shreveport, Louisiana, either for foreclosure work or for other services requiring comparable expertise.

In light of all of the activity involved in the foreclosures in Louisiana and Arkansas, I find that the Louisiana Firm's fees and expenses in the amount of $10,699.78 are reasonable for the pre-bankruptcy services that firm provided.

Upon the filing of the bankruptcy case in Missouri on August 22, 2006, Mr. Naus contacted Tom O'Neal of the Missouri Firm, who had represented Louisiana Ag Credit's predecessor, Production Credit Association, on other matters in the past. This bankruptcy case presented unusual issues requiring research and consideration by counsel. For example, because of the Debtor's Louisiana operations, an issue existed as to whether the bankruptcy

case should have properly been filed in Louisiana, not Missouri. And, because the Debtor had been involved in the auction business, as well as owning farmland, there was a question as to whether he was eligible to file a Chapter 12 case at all. The Missouri Firm took the laboring oar on those issues, as well as on several other issues which arose in the bankruptcy case. The Missouri Firm charged total fees and expenses of $12,318.43 for services performed through September 18, 2007. Mr. O'Neal's hourly rate is $225 per hour, and an associate working on the file was charged at the rate of $160 per hour. I find, based on my experience in examining fee applications for bankruptcy work, that those rates are reasonable, and that the services provided were reasonable and necessary to the proper representation of Louisiana Ag Credit.

Although the Missouri Firm provided extensive services postpetition, the Louisiana Firm also provided some postpetition services. For example, it prepared the proof of claim that was filed with this court. And, when the Debtor sold the real property to pay off Louisiana Ag Credit's claim, Mr. Naus reviewed the closing documents and attended the closing. From a review of his time records, however, it appears that much of Mr. Naus' time consisted of reviewing pleadings filed by Mr. O'Neal and other parties, and drafting and reviewing correspondence both with Mr. O'Neal and with the client. Thus, rather than having Mr. O'Neal deal directly with the client on matters related to the Missouri bankruptcy, Mr. Naus appears to have acted as a go-between. In any event, as to much of Mr. Naus' postpetition work, there is no evidence that such work served to advance his client's position in the bankruptcy case in any meaningful way.

The Louisiana Firm charged a total of $12,642.62 in fees and expenses for postpetition services billed through November 7, 2007, at the rate of $100 per hour. However, that figure includes a total of $2,148.50 which was paid to the Missouri Firm for its first two bills. It appears that the Missouri Firm billed and was paid directly by Louisiana Ag Credit for other services it performed. To avoid double-billing, therefore, the amount charged by the Louisiana Firm will be reduced to $10,494.12. Of that total, $8,340 represents fees for Mr. Naus' services in the bankruptcy case, and $2,154.12 represents expenses other than payment of the Missouri Firm's fees. Based on my own experience and his testimony, I find that the rate of $225 is reasonable for the services provided by Mr. Naus related to the bankruptcy case. However, I find that the useful work he actually did postpetition, given the work already being performed by the Missouri Firm, could have been accomplished in 20 hours or less, so I will allow fees of $4,500 for such services, plus expenses of $2,154.12 (as well as the fees paid to the Missouri Firm). Since the objection to the reasonableness of the Louisiana Firm's fees is well-taken, I find that it is not reasonable for Louisiana Ag Credit to recover, as part of its secured claim, the additional fees incurred for Mr. Naus' attending the hearing on such objection.

Therefore, in addition to the prepetition fees allowed, the postpetition fees and expenses of Wiener, Weiss & Madison are therefore approved, as reasonable, in the total amount of $17,353.90 ($10,699.78 plus $4,500 plus $2,154.12).

Louisiana Ag Credit is, therefore, allowed, as part of its secured claim, attorneys' fees in the total amount of $29,672.33, which represents both the Missouri Firm and the Louisiana

10

Firm's reasonable prepetition and postpetition fees.

As to Leonard Martin's claim for postpetition attorneys' fees, § 506 does not apply to unsecured claims. Hence, we look to § 502 to determine what may be included as part of Martin's unsecured claim.

Section 502(b) provides that, with certain exceptions not relevant here, if an objection is made to a claim, the claim shall be allowed, except to the extent that the claim falls into one of nine delineated categories.[11] Section 502(b) does not contain an express exception for postpetition attorneys' fees. Rather, the only category that arguably supports the disallowance of an unsecured claim for postpetition attorneys' fees is § 502(b)(1) which disallows claims that are "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."[12] In other words, under this provision, if an unsecured creditor's claim for attorneys' fees is unenforceable by agreement or applicable law, it will be disallowed. The question here is whether an unsecured creditor may assert, as part of its unsecured claim, a claim for postpetition attorneys fees that would be enforceable against the Debtor or his property outside of bankruptcy.

Although the Supreme Court touched on the issue in its recent case of *Travelers*

---

[11] 11 U.S.C. § 502(b).

[12] 11 U.S.C. § 502(b)(1); *Qmect, Inc. v. Burlingame Capital Partners II, L.P. (In re Qmect, Inc.)*, 368 B.R. 882, 884 (Bankr. N.D. Cal. 2007).

11

*Casualty & Surety Co. of America v. Pacific Gas & Electric Co.,*[13] it declined to expressly decide it.  However, the Supreme Court reiterated in *Travelers* that courts are to presume that "claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed" under § 502(b).[14]  As seen, § 502(b) does not expressly disallow attorney's fees. While § 502(b) does provide that a bankruptcy court "shall determine the amount of such claim . . . as of the date of the filing of the petition . . .," the Bankruptcy Code permits creditors to assert contingent and unliquidated claims,[15] and "the parties' execution of a prepetition agreement containing an attorneys' fees provision gives rise to a contingent, unliquidated attorney-fee claim."[16] For these, as well as the other reasons recently stated by the Ninth Circuit Bankruptcy Appellate Panel in *In re SNTL Corp.*, I hold that an unsecured creditor's postpetition attorneys' fees are included in its claim, to the extent allowable under applicable nonbankruptcy law.[17]

Accordingly, I conclude that Martin is entitled to a claim for his postpetition attorneys' fees as part of his unsecured claim, to the extent that they are permitted under his agreement with the Debtor and state law.

---

[13] *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, ___ U.S. ____, 127 S.Ct. 1199, 1206,167 L.Ed.2d 178 (2007).

[14] *Id.* 127 S.Ct. at 1206.

[15] 11 U.S.C. § 101(5).

[16] *In re SNTL Corp.*, ___ B.R. ____, 2007 WL 4625246 at *12 (B.A.P. 9th Cir. Dec. 19, 2007).

[17] *Id*. at * 10-12 (and cases cited therein).

Under Louisiana law, attorneys' fees are subject to review and control by the courts and, despite a provision in a note fixing the amount of attorneys' fees as a percentage of the amount to be collected, courts may inquire as to the reasonableness of the fees.[18]

> Factors to be taken into consideration in determining the reasonableness of attorney fees include: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment, and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence and skill of counsel; and (10) the court's own knowledge.[19]

Leonard Martin is represented by the same two firms that have represented Louisiana Ag Credit. The Missouri Firm has billed Martin a total of $2,764.58. The Louisiana Firm has billed a total of $18,124.78. Additional amounts may be billed for preparation for the hearing on the objection to his claim. Since Leonard Martin holds an unsecured claim, with no collateral to protect, which was scheduled by the Debtor as undisputed in the amount of $62,000, and which will be paid in full, fees of that magnitude would certainly be extraordinary. Based on the evidence offered, it appears that substantial work was necessary by the Louisiana Firm because Mr. Martin did not have complete records within his possession to support his claim. Louisiana counsel spent a significant amount of time running down those records, both at the bank whose loan Leonard Martin had guaranteed, and elsewhere. While that bank did make such records available to Mr. Martin's counsel, the

---

[18] *National Information Servs., Inc. v. Gottsegen*, 737 So.2d 909, 919 (La. App. 1999) (citations omitted).

[19] *Id.* at 920.

Debtor contends without dispute that they did not voluntarily make them available to him, even though he had been an obligor on the debt to such bank. Leonard Martin filed a proof of claim in the amount of $117,603.61, which included not only the amount relating to the bank debt, but also the additional funds represented by the two checks issued by him to the Auction Barn from his personal funds. In response, the Debtor objected, and in the objection stated that the claim should be disallowed entirely because Mr. Martin had been paid in full. Throughout, the Debtor was hampered by not having access to records necessary to determine the amount owed. Once the Debtor was given documents showing that a $33,000 check had not been written by the business to reduce the obligation due Leonard Martin, the Debtor readily agreed that the debt in the amount being allowed here was in fact owed. Thus, while Mr. Martin was certainly justified in retaining counsel to represent his interests in the case, the filing and allowance of his claim was all too complicated because of his failure to keep records. In addition, a significant amount of time was expended by Louisiana counsel in simply reviewing work done by Missouri counsel, or in discussing the matter with Missouri counsel, which would not have been necessary had Mr. Martin kept good records, and made those records available to the Debtor in support of his claim. Given the amount of the claim being allowed, and given that it was an unsecured claim, I will allow Leonard Martin attorneys' fees in the amount of $3,000.

### The Claims for Postpetition Interest

The Debtor objects to Louisiana Ag Credit's claim for interest at the default rate, and seeks a remittance as to such amounts previously paid. Like attorneys' fees, § 506(b)

expressly entitles an oversecured creditor to recover, as part of its secured claim, postpetition interest on its claim as provided under the agreement or state statute.[20] In order to be entitled to postpetition interest at the default rate, the contract must so provide, and, generally, the creditor must have triggered the default interest rate by declaring a default and accelerating the loan prepetition.[21]

As stated above, both of Louisiana Ag Credit's notes provide that it is entitled to default interest at 4% above the current interest rate on each respective loan. Louisiana Ag Credit began applying the default rate of interest in March 2006, and also declared the default and accelerated its loans through its letter dated April 12, 2006, which was prior to the August 22, 2006 bankruptcy filing. Consequently, Louisiana Ag Credit is entitled under § 506(b), as part of its secured claim, to its default rate of interest until its claim is paid in full, which occurred in May 2007 at the closing of the sale of one of the parcels of real estate. Further, in contrast to attorneys' fees, the plain language of § 506(b) allows oversecured creditors to receive their contract rate of postpetition interest, regardless of any reasonableness or equitable considerations.[22] In any event, I find the default rate here to be reasonable and equitable.

---

[20] 11 U.S.C. § 506(b); *United States v. Ron Pair Enters., Inc.*, 489 U.S. at 241, 109 S.Ct. at 1030; *In re White*, 260 B.R. 870, 879 (B.A.P. 8th Cir. 2001).

[21] *In re Payless Cashways, Inc.*, 287 B.R. 482, 485-86 (Bankr. W.D. Mo. 2002).

[22] *In re Payless Cashways*, 287 B.R. at 489 (Bankr. W.D. Mo. 2002) (*citing United States v. Ron Pair Enters.*, 489 U.S. at 241, 109 S.Ct. at 1030) (holding that the recovery of postpetition interest is unqualified by § 506).

15

As to Martin's unsecured claim for postpetition interest, § 502(b)(2) expressly disallows claims for unmatured, (*i.e.,* postpetition) interest for unsecured creditors, so Martin would not be entitled to a claim for such interest by virtue of that provision. However, the Chapter 12 Plan, as amended by the Order of Confirmation, provides:

> Unsecured and undersecured creditors shall be paid the lesser of 100% of their claims, or the value of the non-exempt unencumbered property retained by debtor under the plan, in five equal annual installments, beginning February 1, 2008. Debtor estimate [sic] the annual payment to the trustee will be $12,000.00. With respect to all claims under this class, the creditor's exclusive remedy shall be through the terms of this Plan pursuant to § 1222(b)(2) [sic]. Unsecured creditors will also receive their pro rata amount of the proceeds received from the sales of property under the Plan, subject to the payment of claims secured by said property, costs of sale, and administrative expenses approved by the Court, *this being the amount the unsecured creditors would receive if this were a proceeding under Chapter 7 of the Bankruptcy Code.* If these proceeds do not result in full payment of all allowed unsecured claims, then the under secured and unsecured creditors will also receive the disposable income of the debtor, as this term is defined in § 1225(b)(2), during the term of the Plan. If at any time during the liquidation of the property under the Plan, the proceeds collected are sufficient to satisfy all secured claims and all allowed unsecured and under secured claims, no more property will be sold and the deferred cash payments to unsecured creditors shall be eliminated.[23]

If this were a case under Chapter 7, then § 726, which addresses distribution of property in a Chapter 7 case, would apply. Under § 726(a)(5), holders of unsecured claims are to receive payment of interest at the legal rate from the date of the filing of the petition until funds are paid over to the creditor. Consequently, before any funds or property can be paid over to the Debtor, Martin must be paid interest on his claim at the legal rate from the petition date until

---

[23] *See Order Confirming Chapter 12 Plan* (Doc. #183), entered November 14, 2007 (emphasis added).

16

payment to him. The parties do not dispute that the applicable legal rate is 4.5%.

    IT IS SO ORDERED.

/s/ Arthur B. Federman<br>Bankruptcy Judge

Date: January 19, 2008

Attorney for Movant to serve parties not receiving electronic notice